| | | |
|---|---|---|
| SARAH VEASAW, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 4: 2021-CV-02736 |
| | § | |
| HYTORC OF TEXAS INC, | § | |
| AND HYTORC, INC., A Division of | § | |
| UNEX Corporation, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff files her First Amended Complaint and states:

## SUMMARY

Plaintiff Sarah Veasaw ("Plaintiff" or "Veasaw") files her First Amended Complaint and states that Defendants cannot (ii) avoid the anti-discrimination (pregnancy and sex) and retaliation claims Veasaw lodges under Title VII of the 1964 and 1991 Civil Rights Acts (Title VII), 42 U.S.C. § 2000e-5 *et seq.*, and the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et seq.*, by improperly labeling "employees" as "independent contractors"; and (ii) dismiss the proper Title VII and ADA discrimination and retaliation claims Veasaw asserts predicated on the sex-based and disability-based causes of action by relying on Defendants' purported "independent contractor" theory. Thus,



Plaintiff has lodged cognizable Title VII and ADA claims against Defendants. Defendant Hytorc of Texas now admits that it employed more than 15 employees in its Answer to Plaintiff's Original Complaint. (Dkt. No. 8 at paragraph No. 5).

## SERVICE OF PROCESS

1. Hytorc of Texas, Inc. is a subsidiary, franchise, distributor, or related company of Hytorc, Inc. ( a Division of UNEX) and may be served through Scott Chelootz, 12420 Texaco Road, Houston, Texas 77013. Hytorc of Texas has appeared in this lawsuit.

2. Hytorc, Inc., a New Jersey Corporation (Division of UNEX) may be served through its registered agent for service at Hytorc, Inc., 333RT 17 N. Mahwah Street, Mahwah, New Jersey 07430. Hytorc, Inc. (a Division of UNEX) has appeared in this lawsuit.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Plaintiff's federal Title VII and ADA discrimination and retaliation claims because they arise under this Court's federal question jurisdiction. *See* 28 U.S.C. Section 1331 (conferring subject matter jurisdiction over federal claims). In turn, venue is proper in this Court because Defendants conduct business in Houston, Texas, and all or substantially

all of the events giving rise to Plaintiff's claims occurred in Houston, Texas. 28 U.S.C. Sections 1390-1391.

**SUMMARY AND THE EMPLOYEE-
INDEPENDENT CONTRACTOR DISTINCTION**

4.     This is a sex, pregnancy, disability, and retaliation case arising under Title VII of the 1964 and 1991 Civil Rights Act and the Americans with Disabilities Act. Veasaw brings these claims against her former employer, Hytorc of Texas, Inc ("Hytorc") and Hytorc, Inc.[1]

5.     The discrimination, disability and retaliation claims are predicated upon Hytorc's discriminatory treatment directed toward Veasaw and retaliatory conduct Hytorc inflicted upon Veasaw after she informed Hytorc management that she was pregnant. Hytorc and Hytorc, Inc. are covered under both Title VII and the ADA because both Defendants employ 15 or more employees to trigger the statutes' protection.

6. Veasaw was employed with Hytorc of Texas, Inc., a franchise, subsidiary, affiliate, or related company of Hytorc, Inc., located in New Jersey ("Hytorc, Inc."). Hytorc consists of two interrelated entities – Hytorc of Texas, Inc., a subsidiary, affiliate, related company, or licensed distributor and franchise for

---

[1] Veasaw also asserts her claims against Hytorc Inc., the affiliate, franchisor, or related company located in New Jersey. Defendants are "joint employers" under both Title VII and the ADA. Both "employers" share employees, policies, procedures, and other day-to-day operations.

Hytorc, Inc. Veasaw was an employee with Hytorc of Texas, Inc. from June 6, 2016, to August 24, 2020.

7. Hytorc of Texas, Inc. and Hytorc, Inc. have approximately 60-70 employees working in sales. Hytorc of Texas manufactures and sells industrial hydraulic and electric torque wrenches, along with pneumatic wrenches. Hytorc of Texas' market is primarily in the oil and gas and department of defense arenas.

8. Hytorc, Inc. a Division of UNEX, is also responsible for the discriminatory and retaliatory actions recited in this First Amended Complaint because:

    a. Hytorc, Inc. intermingles substantially with Hytorc of Texas.

    b. Hytorc of Texas' essential business operations are subject to rules set by Hytorc, Inc. and, therefore, Hytorc, Inc. has the responsibility of ensuring that Hytorc of Texas adheres to Hytorc, Inc.'s rules and regulations.

    c. Hytorc, Inc. sends Hytorc of Texas business and funds every month and performs repairs of Hytorc of Texas' equipment on a daily basis.

    d. Hytorc, Inc.'s employees train Hytorc of Texas' employees on how to use the billing system as well as Hytorc, Inc. equipment.

    e. Hytorc of Texas used the Hytorc, Inc. billing system, which was a crucial element of Veasaw's position as billing specialist at Hytorc of

Texas. Veasaw's job, as well as other Hytorc of Texas' employees or independent contractors' essential daily interactions were with Hytorc, Inc. employees and/or managers. But while Hytorc, Inc. could exist without Hytorc of Texas, Hytorc of Texas could not exist or operate without Hytorc Inc.'s support.

9. During her Hytorc of Texas' employment, Veasaw reported to Teresa Severance, Hytorc's Controller, who in turn reported to Jimmie Davis, the General Manager and manager of the sales force. Davis reported to Scott Chelootz, the owner of Hytorc of Texas.

## FACTUAL BACKGROUND

The factual background in this case demonstrates Defendants' attempts to circumvent the anti-discrimination laws and to discriminate and retaliate against Veasaw.

A. **Hytorc's Negative Comments about Veasaw's Pregnancy and Hytorc's Failure to Accommodate her Medical Issues**.

10. During her 2019 performance review before Veasaw delivered her child, Hytorc management, including Severance, made comments about (i) the problems with family planning, (ii) children as undesirable, and (iii) how Hytorc made negative employment and hiring decisions based upon a candidate's likelihood to start a family or have children in the near future. To be sure, Veasaw was screening

potential applicants, and management asked Veasaw to make sure they did not have young children.

11. During Veasaw's employment with Hytorc of Texas, management disparaged Veasaw after she disclosed that she was pregnant. For example, Severance asked Veasaw about her family plans and commented that Veasaw's performance had declined since Veasaw became pregnant. Severance expressed to Veasaw that Severance was upset because Veasaw informed others of Veasaw's pregnancy before she informed Severance. Hence, Severance was generally upset that she did not find out about Veasaw's pregnancy first.

12. Before their son was born, Veasaw and her husband purchased a short-term disability policy through Hytorc, which was facilitated through ADP, with a deduction from each paycheck. This short-term disability policy was only purchased because Veasaw knew that Hytorc would not provide her family with any type of paid leave or financial support.

13. Moreover, Hytorc made no effort to provide Veasaw with maternity leave benefits; rather, Hytorc of Texas abruptly canceled her medical insurance approximately eight (8) days after her son was born and without giving her notice of the cancelation. Further, Hytorc paid ZERO DOLLARS in maternity leave, and offered her no support. After four years of employment with Hytorc of Texas, Hytorc offered no accommodations to make it possible for Veasaw to

work easier during her maternity leave. Veasaw worked until the day before her C-Section was scheduled. Her last day of active work was May 21, 2020, and her son was born on May 22, 2020; of course, Hytorc did not offer her any accommodations after she requested an accommodation from Hytorc management related to her pregnancy and complications from her pregnancy.

14. During her unpaid leave of absence between May 2020 and August 2020, Hytorc did not reinstate her medical insurance; to be sure, Hytorc, ADP (a payroll company) and the insurance carrier gave her the run around and failed to give her proper notice of any change in the medical insurance company policy. Indeed, Hytorc, through its insurance carrier, canceled Veasaw's medical insurance.

15. While Veasaw was on maternity leave, Hytorc of Texas changed health insurance providers. Veasaw was not notified that her health insurance benefits would be changing from one company to a different company. A new health insurance policy was started on June 1, 2020, but Veasaw did not receive the insurance packet and cards until the middle of June. Hytorc canceled this new policy on June 30, 2020, without notifying Veasaw that it was canceled, or giving her options under COBRA. Veasaw and her family were covered for one month under a new insurance policy, and the new policy was canceled again. The result was the cancelation of Veasaw's medical insurance without notification.

**B. The Multiple Factor Test to Determine Whether a Worker is an "Employee" or "Independent Contractor" Compels that Conclusion that Hytorc Employed more than 15 Employees under Title VII and the ADA.**

16. As a Hytorc of Texas' employee, Veasaw observed that Hytorc used IRS-1099 forms to classify sales workers as "independent contractors" to avoid and circumvent the employment discrimination laws, namely, to keep the Company's employee count under 15 employees; the 15-employee threshold triggers the EEOC's and this Court's jurisdiction under Title and the ADA. Plainly, Hytorc misclassified its employees as independent contractors to avoid Title VII and ADA coverage and the protection these anti-discrimination statutes provide to employees. Defendant Hytorc now admits so in its Answer to Veasaw's Original Complaint. (*See Dkt. No. 8 at paragraph 5, among other Answer admissions*).

17. Under United States Supreme Court precedent to determine the definition of "employee" versus an "independent contractor," courts apply a multiple factor test.

18. The Supreme Court applies the *Reid* factors, derived from *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41, 109 S.Ct. 2166 (1989). These factors are:

- The hiring party's right to control the means and manner by which the product or tasks are accomplished;

- The skill required;

- The source of the tools or instruments to perform the work;

- The location of the work;

- The relationship's duration between the parties;

- Whether the hiring party may assign additional projects to the hired party;

- The extent of the hired party's discretion over when and how long to work;

- The method of payment;

- The hired party's role in hiring and paying assistants;

- Whether the work is part of the regular business of the hiring party and whether the hiring party is in business;

- The provision of employee benefits; and

- The tax treatment of the hired party.

*Id. See also, Juino v. Livingston Parish Fire Dist. No. 1*, 717 F.3d 431, 434-36 (5th Cir. 2013) (referencing *Reid* factors and balancing test in employee versus independent contractor determination in Title VII context); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228-232 (5th Cir. 2015) (applying common law right to control test in ADA context).

19. In balancing these factors, a court must disregard those factors that, considering the facts of a particular case, are (i) irrelevant; or of "indeterminate" weight, namely, factors that do not cut one way or the other to support a finding that the

worker is an "employee" or "independent contractor." *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 110-111 (2d Cir. 1998).

20. No single factor is dispositive, but the "greatest emphasis" should be placed on the first factor – the extent to which the hiring party (Hytorc) controls "the manner and means" by which the Hytorc worker completes his or her work. *Reid,* 490 U.S. at 752, 109 S. Ct. 2166. According to the Supreme Court, an employer-employee relationship exists "if the purported hiring party controls or has the right to control both the result to be accomplished and the "manner and means" by which the purported employee brings about that result." *Cilecek v. Inova Heath Sys. Servs.,* 115 F.3d 256, 260 (4th Cir. 1997) (distinction between "employer and independent contractor rests on the degree of control exercised by the hiring party").

## C. Hytorc Attempts to Avoid Title VII and ADA Coverage by Misclassifying "Employees" as "Independent Contractors."

21. Here, the Court should conclude that Hytorc's attempts to avoid Title VII and ADA coverage by misclassifying most of its workers as independent contractors. This Hytorc cannot do. The *Reid* multiple-factor test reveals that most of the workers in Hytorc sales are employees and not independent contractors:

- The hiring party ("Hytorc" Texas) controls the manner and means by which the product, namely, specialized torque wrenches, is accomplished and later sold to Hytorc customers.

- All sales are completed through Hytorc's computer system; Hytorc trains every salesperson; Hytorc products are manufactured by Hytorc or shipped

to Hytorc of Texas, Inc. from Hytorc New Jersey. In turn, Hytorc billing is submitted to the office in New Jersey through its billing system. Accordingly, Hytorc, Inc. controls the billing system that is used by its subsidiary, Hytorc of Texas, and its salesforce workers. Hytorc Texas also controls the manner and means by which the sales force conducts its work. Thus, the first Reid factor weighs heavily in favor of a finding that the Hytorc of Texas sales workers are employees and not independent contractors. *See Reid,* at 752.

- Hytorc staff trains the salesforce workers to install, demonstrate and use the hydraulic wrenches. No special skills are required. This factor weighs in favor of the salesforce as "employees."

- Hytorc is the source of all tools and instrumentalities that salespersons use to perform their jobs. Hytorc, for example, has company trucks for sales workers and provides the sales workers with vehicles as part of their job. Further, Hytorc's van drivers do not own their vans; the Hytorc salesforce, therefore, relies solely on Hytorc for the tools to perform their jobs.

- Hytorc of Texas' location is in Houston, Texas and the sales workers are assigned territories. Hytorc of Texas determines and controls the territory in which each salesperson works. Accordingly, Hytorc sales workers cannot just sell anywhere, but must comply with Hytorc of Texas' instructions about the location of their work.

- The work relationship between Hytorc and Veasaw lasted for over four years and many of her peers worked for Hytorc for many more years. Therefore, the work performed by the so-called "independent contractors" is not a small side job, but constitutes essential work integral to Hytorc's business. Hence, this factor weighs in favor of employee status.

- Hytorc has the right to assign additional projects to the hired salesperson; indeed, Hytorc has done so on several occasions. This is another factor weighing in favor of employee status under both Title VII and the ADA. While the alleged independent contractors have some small control of their hours, the majority of when and how long to work is controlled by Hytorc. *See Reid* at 752.

## PLAINTIFF EXHAUSTED HER
## ADMINISTRATIVE REMEDIES

22.     Plaintiff filed her discrimination and retaliation claims with the EEOC on

October 20, 2020.  Thereafter, the EEOC issued its right to sue letter to Plaintiff

on June 7, 2021. Accordingly, Plaintiff has timely filed her discrimination and retaliation claims under Title VII and the ADA.


## FACTUAL BACKGROUND

23. Plaintiff gave birth to a child on May 22, 2020. Before giving birth and after informing Hytorc that she was pregnant, her immediate supervisor, Teresa Severance, and another manager, Jimmy Davis, made negative comments about Veasaw's pregnancy. These included, without limitation, the trouble Veasaw would face with "family planning," having children being undesirable, and screening potential new hires to make sure they do not have young children. Severance instructed Veasaw to screen out potential hires who may become pregnant. Further, Hytorc did not offer Veasaw any maternity leave benefits while she was on medical leave for her pregnancy.

24. After giving birth, Hytorc's discrimination leveled against Veasaw escalated – management continued to make inappropriate "family planning" comments (among other negative comments), to Veasaw, canceled her health insurance without notice, and refused to accommodate her need for medical insurance to allow her to undergo surgery to remove small infections after her son was born. Moreover, during a screening before her son's birth, her OB-GYN informed her that a biopsy of polyps on her cervix had come back as positive, containing pre-

cancerous or abnormal cell growth. It was imperative during the weeks after birth that she undergo surgery to remove these polyps. During this time, Hytorc changed medical insurance carriers, but canceled the new policy without giving notice to Veasaw.

25. Given the close proximity to childbirth, the OB-GYN recommended that Veasaw wait approximately 8-10 weeks after birth to allow her vascular health to improve and to reduce the risks of a second surgery. Because her health insurance was canceled without notice, she was unable to receive the surgery she needed. Hytorc then retaliated against Veasaw by informing her that she had exhausted her unpaid leave and the Company would terminate her employment if she did not return to work by August 24, 2020. Veasaw did not return to work based on the pervasive discriminatory and retaliatory treatment she suffered, and Hytorc's cancelation of her medical benefits and denial of her short-term disability claim. Based on these and other facts, Hytorc constructively terminated her employment on August 24, 2020.

26. Indeed, the following facts demonstrate how Hytorc's culture is slanted against women and is blatantly discriminatory, and employs hiring practices that are consistent with a company operating in 1920, rather than 2021. To be sure, Hytorc discriminated against Veasaw because of her (i) sex (female), (ii) her pregnancy, and (iii) her disability (cancerous tumors). Hytorc denied her

promotions, offered her promotions that were retracted, and hired new employees without Veasaw's education level or experience.

27. In turn, through its insurance carrier, Hytorc cancelled her health insurance without proper notice and, in turn, she was unable to receive timely medical care for her pre-cancerous cervical biopsy and her baby's medical condition. Hence, Hytorc's actions were simultaneously discriminatory, dangerous, and needlessly cruel.

28. The stress related to having a newborn child with potential disabilities is especially difficult and presents unique challenges. The stress and anxiety are compounded where, as here, Hytorc changed its short-term disability plan, and ultimately cancelled its short-term healthcare benefits without proper notice to Veasaw. Plainly, Hytorc targeted Ms. Veasaw with a campaign of mistreatment and discrimination

29. Before her 2018 positive performance review, through both Davis (the GM of Hytorc) and Severance (the Controller of Hytorc), the Company offered a new position to Veasaw, namely, "Client Relationship Manager," created by Davis and Scott Chelootz, the owner of Hytorc of Texas. At this time, the only other Hytorc employee who shared the accounting/receptionist position was Alexandra Cadena (Alex).

30. Management (Davis and Severance) and Veasaw agreed that they did not believe Alex Cadena would be a good fit to replace Veasaw's position as Billing Specialist, and Davis asked Veasaw to interview potential candidates with Severance. Unfortunately, Severance, in her role as a member of management, made multiple negative comments about working mothers directly and indirectly to Veasaw. Severance found it "so annoying" that Alex brought her son to work every other Friday, that Severance "notice[d] how often it was happening," and "so gross" that [Alex's son] would use the women's bathroom by her office, and pee on the seat or not close to the toilet lid.

31. During the hiring process to find a Billing Specialist to fill Veasaw's position, Hytorc used CareerBuilder to screen resumes. Before candidates were brought in for an interview, Hytorc informed Veasaw whether its social media accounts would find someone that "fit in with the culture" at Hytorc. This meant mostly pretty, young women were brought in for interviews, and no black women or males were interviewed for these specific positions. Severance asked Veasaw to exclude black and male candidates upon review of the candidates' social media for these 2 specific positions. Management (both Jimmie Davis and Teresa Severance) made it clear and expressed the desire to hire another bilingual (Spanish-speaking) female to fill the receptionist position, which Alex had

previously held, vocalizing the belief that the addition of a bilingual female Billing Specialist would be advantageous for Hytorc.

32. In multiple interviews that Veasaw sat in with Severance in January, February, and March of 2019, Severance asked women if they had children, even saying to one top candidate, "I know I'm not really supposed to ask this, but I'm just wondering because I'm a mom," since the candidate had expressed work/life balance complaints with her current position.

33. In another instance when Ms. Veasaw was present, one candidate that had a background in billing and a private social media account expressed that she "just had a baby" and, while Severance gave what seemed to be her sincere congratulations during the interview, Veasaw remarked how the candidate seemed like a great fit, to which Severance responded, "yeah but not with a baby. You still have all these doctors' appointments and babies get sick all the time."

34. Veasaw ignored Severance's comment because Veasaw thought Severance knew what she was talking about because, like she said, she was a mom. After sitting through multiple interviews and listening to Severance's negative remarks Severance made about qualified female candidates with children, her discriminatory behavior weighed heavily on Veasaw's conscience. Coupled with the additional responsibilities of a short staff and a growing workload, Veasaw

began to prioritize rental billing, which was rapidly expanding with Hytorc's growth.

35. Veasaw still believed she was underpaid for her contributions to Hytorc before Alex Cadena quit, and Davis and Severance both assured Veasaw they were going to speak to Scott Chelootz to schedule a meeting so Veasaw could plead her case to explain why she deserve(d) a higher-than-approved raise to him, which Veasaw still had not received at the time – Veasaw had asked for help in the rental billing department for over a year.

36. Veasaw's March 2019 meeting with management concluded with Severance offering her minimal support in front of Davis by assisting with the rental workload -- Severance pledged to take on the "easy" accounts, or the sales reps that usually had little to no "special billing requests" and who kept up with their inventory fairly well.  Of course, Veasaw would continue doing most of the receptionist duties until Hytorc trained a new candidate, in addition to continue working with the "difficult" rental accounts.

37. Veasaw alone trained both Lisa Madera and Anahi Rubio for the receptionist position and billing position, except for a couple days where they both sat with the customer service department to make sure they understood the flow of the work.  After Veasaw trained both Anahi and Lisa, Hytorc later snubbed Veasaw's

promotion, while simultaneously creating a Project Manager position, hiring Derek Forrest, in addition to two additional sales positions and giving them additional employee benefits than Veasaw had requested when Hytorc offered Veasaw the Client Relationship Manager position. The benefits given to these employees, to Veasaw's exclusion, included tangible goods like company cars, phones, and laptops for each, along with the single intangible good that Veasaw made clear Veasaw desired, namely, flexibility.

38. Further, Veasaw did not receive sufficient training to perform the duties of her job as Billing Specialist; during her four years of employment, Hytorc did not afford her the same Hytorc training on the technical specifications of Hytorc equipment, including torque sizes and safe bolting practices, which was offered to all male employees, in addition to Lisa Madera and Anahi Rubio upon their hire. Veasaw mentioned multiple times to management that she was interested in learning this material because she often assisted with customer requests for quotes and processing sales when the customer service department and other sales representatives were unavailable. Nevertheless, Hytorc did not train Veasaw.

39. Veasaw also noticed how Hytorc (Severance and Davis) treated her in July 2019. Veasaw was no longer included in casual conversations about decisions Hytorc made; nor did management discuss the direction Hytorc was heading.

Severance's friendly attitude towards Veasaw completely shifted because Veasaw suspected that Severance realized the "easy" rental accounts that Severance helped Veasaw with were still not very easy and required much more thought and effort than Severance was used to with the Hytorc mobile van repair department billing. In July 2019, Veasaw began to worry about her future with Hytorc under Severance's direction, while still remaining optimistic about the newer employees Lisa and Anahi and advancing with Hytorc in a different direction as the Client Relationship Manager.

40.    After Severance returned from her medical leave of absence stemming from a car accident, Severance felt threatened that the office was able to function normally despite Veasaw's leave of absence and, upon Severance's return from medical leave, Severance began to retaliate against Veasaw. Severance began micro-managing Veasaw's work in an unprecedented manner, except for the previous female employee mothers Veasaw named whom Severance took credit for pushing out of Hytorc -- Alex Cadena, Karla Alfaro, and Seantae Flores. Veasaw started getting rude and sending Veasaw passive-aggressive emails about things she had supposedly "missed," which included minor errors.

41. Veasaw also received negative treatment and comments from Severance about not responding "thank you" to acknowledge emails Severance sent, which is the

only reason Veasaw later responded "thank you" to the text Severance sent her on 25 June 2020 after telling her to add her son to a COBRA policy that she was not offered or understood. Veasaw later used Google to ascertain that COBRA was for employees who were terminated from employment. After later receiving Severance's text message on 25 June 2020, Veasaw asked her husband what COBRA was because, even though HR administration was Severance's department, COBRA was never mentioned to her, even after Davis's acknowledged in an email notification on 2 June 2020 in which he stated that Hytorc would cancel Veasaw's family's and her medical coverage.

42. Veasaw signed a STD application on 23 September 2019 after Davis's encouraged Veasaw to enroll in a STD policy. When Veasaw's co-worker, Lisa Madera, asked Veasaw questions about the STD policy, Veasaw encouraged her to ask Davis because he was the facilitator trying to assist with coverage. Lisa Madera was still in her office when Davis walked by and she asked him if the STD policy would help in the event of a pregnancy. Davis's response was "yes, it should, just don't go getting pregnant on me," which he preceded with a laugh. Veasaw assumed she was not pregnant at this time, and she still had not disclosed her marriage or desire for children to management.

43. Veasaw then disclosed her marriage to Davis when Veasaw had a question on the STD application, which asked for Veasaw's marriage status when Severance was out of the office stemming from a car wreck.

44. Around 14 October 2019, Veasaw received a letter stating that her STD policy became effective 1 November 2019. She received this letter from Davis, who received it through Hytorc, and he instructed Veasaw to email a copy to Severance when he handed the acceptance letter to Veasaw. Veasaw did so.

45. On October 14, 2020, the date of her first OB-GYN appointment with the doctor who later delivered her son, Veasaw learned that she had a positive pregnancy test. She had already requested off in advance because, contrary to Davis's statement, employees were not paid out for unused paid time off ("PTO") in 2019. Hytorc's practice of paying out employees for unused PTO days ended in 2017, shortly after Veasaw signed her original job offer, which was a contributing factor why Veasaw was adamant about being paid a fair hourly rate in 2018 through 2019. On 14 October 2019, Veasaw was not aware if her positive pregnancy test was an error, or if the possible pregnancy was viable so she wanted her doctors to confirm.

46. In November 2019, when her doctor confirmed that Veasaw was pregnant and her pregnancy was progressing normally, part of Veasaw believed that something

would go wrong because she was already so stressed about her work situation since Severance returned from her leave of absence with what seemed to be a personal grudge against Veasaw. Veasaw began asking her husband to consult with his attorneys to request advice so Veasaw would feel more comfortable disclosing her pregnancy to Hytorc, given Severance's prior discriminatory comments about working mothers. At this point, Veasaw correctly predicted to her husband, that after announcing her marriage and pregnancy to Hytorc, she would receive the worst review she had experienced in her time with Hytorc, despite her efforts to succeed.

47. On November 18, 2019, Veasaw emailed Severance and requested to leave early for a doctor's appointment that the doctor scheduled for 2 December 2019. Severance had already approved a week of PTO for Lisa Madera (from 3 December 2019 - 10 December 2019) to attend her sister's wedding, so Veasaw did not believe that leaving early one day, to make it to a doctor's appointment, would place any undue hardship on the other employees working, including Lisa, before she took her approved vacation. In over her 3 years at Hytorc, Veasaw had never requested additional time off in December. She sent Severance her request via email. Severance received Veasaw's email and rejected her request 6 minutes after receiving it. At this point, it was still early in her pregnancy, and Veasaw was uncomfortable disclosing any additional information given Severance's prior

discriminatory comments. Accordingly, Veasaw worked with her doctor to reschedule the appointment on a different day.

48. In Veasaw's Performance Review after disclosing her pregnancy to Hytorc, Severance told Veasaw "It seems like you always try to go above my head for things, and that you think I'm not going to find out about things."

49. Severance continued, starting her sentence with the words Veasaw heard from previous interviews of prospective candidates, "I know I shouldn't say this, but even when you told us about your pregnancy, I did not know if you constantly go to Jimmie and Scott because you think they'll go easier on you, but that's what it seems like to me. I'm your direct supervisor." Veasaw recalled the comments she made previously to her about Alex, Karla, and Seantae. Now she was picking on Veasaw. In response, Veasaw denied not following the chain of command because other than how Veasaw informed management of her pregnancy, the only example Severance provided was the spreadsheet. Nevertheless, Veasaw maintained that she only went to Davis about the spreadsheet because he is the manager who assigned her that task. Severance shrugged. She then told Veasaw that she was not keeping Severance informed and giving her enough updates about her pregnancy. Veasaw told Severance this was Veasaw's first pregnancy, and she barely had any doctor's appointments at this point, nor did Veasaw know what information she was supposed to give Severance.

50. Shortly thereafter, Veasaw went to work as usual after her negative review and began giving Severance an abundance of information despite feeling like it was invasive and a violation of Veasaw's right to privacy.

51. After disclosing her pregnancy and disability issues with Severance on 20 December 2019, Davis called Veasaw into his office and requested that Veasaw stay late to answer the phone when almost every other Hytorc employee had left early to enjoy an extended weekend courtesy of Scott Chelootz's well-known holiday generosity.

51. Three months later, on 19 March 2020, Severance encouraged Hytorc's employees to "create as much productivity" as they could, and unpaid leave was an option. According to Hytorc, "productivity was a quantifiable figure measured in QuickBooks by searching the "Entered By" function to see how many lines of billing an employee entered. On multiple occasions, Severance referenced how Veasaw's numbers were lower than hers, which Veasaw believed contributed to a workplace culture that pitted managers against employees. The nature of Severance's Hytorc van repair work doubled her numbers because she entered an estimate and, once provided a PO or method of payment by a customer, she hit "Create an Invoice," which generated a copy of her estimate. This changed the template to an invoice or sales order depending on how the customer was billed.

52. Virtually the same was true for ongoing rentals, or rentals that lasted over the end of the billing month, likely a contributing factor to explain why Severance would not give back the rental accounts she acquired after additional staff was already trained in billing. Additionally, in her email, Severance stated that procedures would be changing to help reduce the possibility of contracting or spreading the Covid-19 virus, and Anahi, Lisa, and Veasaw would all be responsible for their own filing, which was usually a receptionist's responsibility.

53. On 23 March 2020, Veasaw was visibly pregnant. Veasaw walked into her office, early as usual, and noticed a stack of paperwork that did not belong to her. Veasaw inspected the paperwork. It was completed rental paperwork to be filed, with the dates on the paperwork from February 2018 to July 2019; the paperwork had Severance's name on them. Veasaw, as a result, had to lift heavy boxes to file Severance's paperwork because the older paperwork was already in the storage warehouse or sitting out by the company kitchen in stacked boxes. At this point, Veasaw wondered if Severance wanted to harm Veasaw or her unborn child.

53. And then there is the issue of healthcare coverage. On 13 April 2020, Veasaw elected healthcare coverage effective 1 June 2020 and added her husband to her plan with Aetna as they still planned to grow their family while she worked at Hytorc. She was already obviously pregnant at this point. For some reason,

Hytorc changed employee medical insurance carriers every 6 months. Her previous health insurance, through United Healthcare, was effective for the 6 months before 1 June 2020, including when she delivered her son on 22 May 2020. Hytorc contributed $0 towards her employee healthcare coverage with Aetna after 1 June 2020, while she was still on unpaid maternity leave, and after she made Hytorc management aware that her STD claim had been denied as a sickness because she visited her delivering doctor on 14 October 2019 before receiving confirmation that her pregnancy was viable.

54. Additionally, after disclosing her pregnancy, Severance asked Veasaw when she was working from home to keep up with yet another spreadsheet -- this time, a more feasible spreadsheet, of hotshot and delivery charges, with notes, because Veasaw assumed Severance believed Veasaw was committing errors when she was actually following protocol (per the Terms & Conditions of the rental department's contracts, which she edited and wrote for the company, and were subsequently approved by all members of management) not to charge Hytorc customers for delivery charges arising from the failure of Hytorc equipment at no fault of the customers. Around the same time, the office started getting phone calls that Hytorc's vendors were not being paid on time. Veasaw accepted a couple of the calls and requested the vendors to send her what they showed outstanding so she could research the charges. Apart from a couple newer vendor

invoices with missing paperwork, at no fault of Veasaw, Hytorc received all invoices, and Veasaw sent a spreadsheet to Severance so she could easily search and justify charges to pay vendors in a timely manner.

55. On 21 May 2020, her last day of work before Veasaw's scheduled C-section, Severance called Veasaw into her office, alone, to ask Veasaw if she still intended on returning to work after her pregnancy. In response, Veasaw said she planned on returning to Hytorc; Severance then asked her if she applied for STD or if she knew how. Veasaw said she did not apply yet, because it was her understanding that it was to be used after her surgery, Veasaw's PTO was used, and she did not know how to apply. Severance stated after their meeting concluded that she would email her the information Veasaw needed to make a claim. Veasaw asked Severance if the application process was easy, and she responded that if Don Brandon (a previous employee) could do it, she thought anyone could do it. The meeting concluded.

56. Several days after giving birth to her son in May 2020, Veasaw and her husband returned home from the hospital. Although it was typical of C-section recovery to stay in the hospital for multiple days, Veasaw's doctors, nurses, and Veasaw agreed that it would be best to return home to care for her baby given the growing unknown stemming from the Covid-19 pandemic.

57. On 29 May 2020 at 3:43pm, Veasaw made Severance aware via text that she received notice her STD claim was denied as a pre-existing condition and told her she was unsure of what happens next. Severance replied at 9:52pm confirming she spoke with Guardian, the provider, and Guardian had only asked basic questions like pay and the activity her position required. Severance said nothing to address Veasaw's concerns about what happens next. Nevertheless, she remained optimistic in the passing days that Severance would either do her research and inform Veasaw when she had additional news, or she would speak with Davis and Scott Chelootz to see if they could offer any additional assistance or peace of mind. Unfortunately, Severance said nothing.

58. On 25 June 2020, Veasaw received notice that Hytorc was canceling her healthcare coverage. Again, Veasaw was confused, and Hytorc never informed her that her healthcare coverage was going to be canceled. To be sure, she had not recovered from her C-section and, as a result, she was unable to get her second surgery to remove the pre-cancerous cells her doctors found on her cervix. On 6 July 2020, Veasaw received an email stating that her healthcare coverage would be terminated retroactively at the end of June 2020. Ultimately, Hytorc constructively terminated Ms. Veasaw's employment on August 24, 2020, based on Hytorc's discriminatory and retaliatory conduct against Ms. Veasaw and its fraud against Veasaw about her healthcare benefits.

## CAUSES OF ACTION

Based on the facts recited in this First Amended Petition, Veasaw lodges the following claims against Defendants:

## COUNT 1 – TITLE VII AND PREGNANCY DISCRIMINATION CLAIMS

59. As explained in detail in the factual section of this First Amended Complaint, Hytorc and Hytorc, Inc. discriminated against Veasaw because of her sex, female, and her pregnancy. Hytorc subjected Veasaw to negative comments about family planning, the undesirability of having children, and screening out job candidates who are married and may have children. Regarding her pregnancy, Hytorc did not provide her paid maternity leave, the insurance carrier denied her short-term disability leave, Hytorc did not pay her anything while she was away on maternity leave, and Hytorc management continued to make negative comments about her pregnancy. Therefore, Hytorc and Hytorc, Inc. violated the anti-discrimination and anti-retaliation provisions in Title VII. As explained in detail in this First Amended Complaint, Hytorc, Inc. is also culpable for the discriminatory actions against Plaintiff.

## COUNT 2 – ADA DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE

60. Plaintiff suffered from a disability, namely, serious complications stemming from her pregnancy and the birth of her son. Accordingly, she

suffered from a disability, had a record of a disability, and Hytorc perceived her as an employee with a disability. The complications included pre-cancerous tumors in her cervical area. Nevertheless, Plaintiff was qualified to perform her job with a reasonable accommodation. After Plaintiff asked for an accommodation, Hytorc never offered her a reasonable accommodation, such as obtaining medical benefits for Veasaw or giving her a flexible schedule. Nor did Hytorc engage in the interactive process with Veasaw to find a mutually agreeable accommodation.

61.     When Plaintiff requested flexibility for her need for surgery, her surgery was denied because Hytorc had canceled its medical benefits insurance policy without giving Veasaw notice of the cancelation. Thus, her medical benefits claim was denied and Hytorc did not offer to assist her in any way.

62.     Veasaw then received a letter from Hytorc stating that it would terminate her employment if she did not return to work by August 24, 2020. Thus, Hytorc constructively terminated Veasaw's employment on August 24, 2020. Hytorc's conduct violated Title VII and the ADA by discriminating and retaliating against her.

# CONCLUSION

63. In view of the factual allegations in Veasaw's First Amended Complaint, as applied to her causes of action, she requests the following damages:

    a.  Backpay or lost wages;

    b.  Front pay or lost future damages;

    c.  Emotional distress damages;

    d.  Punitive damages;

    e.  Attorneys' fees and costs; and

    f.  Post and pre-judgment interest on a final judgment in Veasaw's favor.

Respectfully submitted,

By: /s/ Dean J. Schaner
Dean J. Schaner
Texas Bar No. 17726500
Schaner Law Firm PLLC
5313 Pocahontas St.
Bellaire, Texas 77401
Telephone: 832-548-1478
deanschaner@schanerlawfirm.com
Attorney for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2021, a true and correct copy of Plaintiff's First Amended Complaint and Jury Demand was served by the Court's EFC system to the following:

Pamela Banks Linberg
Jackson Lewis PC
717 Texas Avenue, Suite 1700
Houston Tx  77002
713-568-7871
Pamela.Linberg@jacksonlewis.com'
Lead Attorney

Laura Balhoff Englert
Law Offices of Kinberly R. Snagg
10375 Richmond Avenue, Suite 1050A
Houston, Texas 77042
713-243-7059
lenglert@hanover.com


                                         /s/ Dean J. Schaner
                                        Dean J. Schaner